**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 10, 2020

*Stephe, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 10, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Recall of | ) )  No. 98897-8 ) ) ) |
| Jenny Durkan, City of Seattle Mayor | ) )  En Banc ) ) ) |
| _____ | )  Filed: <u>December 10, 2020</u> |

YU, J.— This case involves cross appeals regarding a petition to recall Seattle Mayor Jenny Durkan based on events that occurred at protests following the killing of George Floyd. The recall petition alleges that Mayor Durkan failed to adequately control the Seattle Police Department's (SPD) response to the protests, allowing the police to use unnecessary force and causing significant harm to nonviolent protesters, local residents, media

representatives, and medical aid workers. Of the seven recall charges, six were dismissed by the trial court and one was allowed to move forward. Mayor Durkan appeals the charge that was allowed to move forward, and the recall petitioners appeal the dismissal of two other charges. On October 8, 2020, we issued an order affirming the trial court's dismissal of two recall charges and reversing the finding that one charge was sufficient for recall. We now explain that order.

BACKGROUND

On May 25, 2020, George Floyd was killed by police in Minneapolis, Minnesota. Widespread protests against police brutality swiftly followed. Protests began in Seattle on May 29 and continued regularly thereafter. The protests were largely peaceful, but on multiple occasions, there were conflicts between the crowds and SPD. In response, SPD used "less lethal" methods of crowd control, including tear gas (also known as CS (chlorobenzylidenemalononitrile) gas), pepper spray (also known as OC (oleoresin capsicum) gas), and flash-bang grenades, multiple times beginning in late May.

Numerous protesters were seriously injured, and tear gas seeped into the homes of local residents, causing ill effects to both their health and their

property, and forcing some to evacuate the area entirely. SPD officers also suffered injuries. The parties dispute who was responsible for initiating and escalating these conflicts. The recall petitioners contend that SPD's response to the conflicts was both unreasonable and unlawful, and that Mayor Durkan should be recalled for her failure to control their actions.

A.      Factual allegations regarding SPD's use of force

The recall petitioners' case focuses primarily on SPD's use of "chemical agents," namely pepper spray and tear gas, particularly in light of the heightened health risks they pose during the COVID-19 pandemic. 2 Clerk's Papers (CP) at 303. In addition, they allege that SPD prevented medical aid workers from attending to the injured and prevented members of the media from doing their jobs.

The use of pepper spray is governed by specific guidelines contained in the SPD manual. The manual provides that pepper spray may be used "Only When Such Force is Objectively Reasonable, Necessary, and Proportional," and cannot be used without a prior verbal warning, unless "giving the warning would compromise the safety of the officer or others." *Id.* at 202-03. There is no dispute that SPD used pepper spray on numerous occasions to disperse and control the crowds at the protests. The recall

petitioners contend that SPD did not follow its own guidelines when doing so, using pepper spray when it was not necessary and without prior verbal warnings. They also contend that "pepper spray presents almost the same danger profile with regard to the pandemic" as tear gas "by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing." Resp. Br. & Opening Br. of Cross-Appellant at 7 n.8; 1 CP at 55.

On May 31, two days into the protests, SPD requested special authorization from Seattle Police Chief Carmen Best "to enable patrol to use CS Gas in the necessary event of crowd [dispersal]." 1 CP at 176. SPD asked to be allowed to use tear gas, which is not specifically referenced in the SPD manual and is not generally used by patrol officers (as opposed to SWAT (special weapons and tactics) teams), according to the same guidelines that apply to the use of pepper spray. The stated reason for SPD's request was that on May 30, individuals "who appeared to be unaffiliated with the peaceful march, assaulted officers, set fire to police and citizen vehicles, smashed windows of and looted numerous businesses throughout the downtown core, and otherwise caused extensive mayhem and property damage." *Id.* at 69. Police efforts to control the situation had "largely depleted" their supply of pepper spray and "blast balls," raising a concern

that if such events were to recur, they would have no effective means of responding. *Id*. SPD requested "that the authorization and exemption stated here remain in place for 14 days or until Patrol determines that it has sufficient standard issue less-lethal devices on hand." *Id.* at 70. Chief Best granted the request. SPD used tear gas on the crowds on June 1 and June 2, with the authorization of the "IC" (incident command). 3 CP at 411, 403.

Several key events took place on June 5. SPD advised Chief Best that it "has received what it believes to be sufficient additional supply of standard issue crowd management tools," such that the special authorization for the use of tear gas was no longer necessary. 1 CP at 71. Chief Best agreed to rescind the authorization, and SPD issued

> a departmental directive prohibiting the use of CS gas except the following circumstances: "Where SWAT is on-scene, consistent with Manual Section 14.090(4), SWAT will follow all department policies and procedures regarding the use of specialty tools, to include the use of CS gas, in life-safety circumstances and consistent with training."

*Id.* at 177 (emphasis omitted). The directive also restricted SWAT's authority to use tear gas by requiring that before doing so, "until further notice, any deployment must be approved by the Chief or the Chief's designee." *Id.* (emphasis omitted). The directive was to remain in place for at least 30 days. 3 CP at 445.

Also on June 5, Mayor Durkan sought the advice of numerous entities concerning SPD's crowd control methods. The entities included the Seattle Office of Police Accountability, the Seattle Office of Inspector General, the court appointed Federal Monitor, the Seattle Community Police Commission, and the Department of Justice. The Mayor specifically requested a determination as to "what innovative techniques, or combination of techniques, can provide a greater ability to de-escalate situations that occur with mass protests, so that the use of force can be greatly minimized and avoided" and "a recommendation about the use of CS gas in any situation." *Id.* at 444.

That same day, the Seattle Office of the Inspector General, the Seattle Community Police Commission, and the Seattle Office of Police Accountability sent a joint initial response, noting that while the SWAT manual contains guidance "for specialty unit use of tear gas," the department-wide SPD manual itself "does not reference the use of CS gas nor the conditions under which it can be used for general crowd control." *Id.* at 469-70. The response also expressed concern that the use of tear gas for crowd control "was not approved by the federal court in the context of the Consent Decree" (discussed further below), "is not consistent with how the City envisions policing its communities," and has the "potential to

increase spread and vulnerability to COVID-19." *Id.* at 470. The joint response therefore requested that SPD "cease the use of CS gas in response to First Amendment activity, until such time as any appropriate use can be vetted by oversight entities and incorporated into a written SPD policy." *Id.* at 469.

Two days later, on the evening of June 7, conflicts escalated again, and, believing that the necessary "life-safety circumstances" were presented, SPD requested Chief Best's authorization for SWAT to use tear gas shortly after midnight on June 8, which she granted. 1 CP at 179.

There does not appear to be any evidence that tear gas was used after June 8. However, the recall petitioners assert that the inappropriate use of pepper spray has continued; SPD is still attacking protesters "without motivation, provocation, or warning"; and "violence still breaks out regularly between SPD and Seattle citizens." Resp. Br. and Opening Br. of Cross-Appellant at 10, 9. Chief Best has since resigned and been replaced by Interim Chief Adrian Diaz, the former deputy chief.

B.     Relevant federal cases

In addition to this recall case, there are two ongoing cases in federal court that are relevant to our decision here.

1.      "Consent Decree" case

In 2011, the Department of Justice (DOJ) "investigated SPD for a potential pattern or practice of unconstitutional policing and excessive force." *United States v. City of Seattle*, 2020 WL 4275515, at *1.  On July 27, 2012, the United States filed a complaint in the federal district court for the Western District of Washington.[1]  On the same day, the federal government and the City of Seattle filed a proposed "Settlement Agreement and Memorandum of Understanding," commonly known as the Consent Decree, "with the goal of ensuring that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public and officer safety, and promotes public confidence in" SPD.  3 CP at 522.[2]

The Consent Decree includes numerous provisions for limitations and oversight of SPD's policies and practices, including the use of force

---

[1] The complaint is available on the DOJ's website at https://www.justice.gov/sites/default/files/crt/legacy/2012/07/31/spd_complaint_7-27-12.pdf [http://perma.cc/JD8H-53FB].

[2] These quotes are from the original Consent Decree as proposed by the parties, which is in the record and may also be found on SPD's website at http://www.seattle.gov/Documents/Departments/Police/Compliance/Consent_Decree.pdf [https://perma.cc/LP3T-UKBA].  The Consent Decree that was ultimately approved by the federal district court was modified, but the modifications do not appear to be material here.  They may be found on the Department of Justice's website at https://www.justice.gov/sites/default/files/crt/legacy/2012/11/28/spd_orderapprovingsettlement_9-21-12.pdf [https://perma.cc/MA5L-LDCN].

generally and the use of pepper spray specifically. *Id.* at 537-38. The Consent Decree mandates that "SPD will submit the policies, procedures, training curricula, and training manuals required to be written, revised, or maintained by the Settlement Agreement to the Monitor and DOJ for review and comment prior to publication and implementation." *Id.* at 572. Before the Consent Decree may be terminated by the court, the City of Seattle must reach "full and effective compliance" with its requirements and then remain in compliance for at least two years. *Id.* at 591.

In January 2018, the federal district court granted the City's motion to declare that it had achieved full and effective compliance, although it cautioned that maintaining compliance for at least two years may be "the most difficult portion of the Consent Decree to fulfill." *United States v. City of Seattle*, 2018 WL 348372, at *6. Less than one year later, in December 2018, the court ordered the parties to show cause as to whether the City "has failed to maintain full and effective compliance with the Consent Decree." *United States v. City of Seattle*, 2018 WL 6304761, at *1. In May 2019, after hearing from the parties, the court found that the city had failed to comply with the Consent Decree's accountability requirements and directed that "the City will need to come back into full and effective [compliance] with the Consent Decree, and then maintain that compliance for two years.

9

*United States v. City of Seattle*, 2019 WL 2191871, at *1. In all other areas, the two-year clock continued to run. *Id.* The Consent Decree remains in effect to this day.

### 2. Federal tort case

In early June 2020, Black Lives Matter Seattle-King County, along with several individual plaintiffs, sued the City of Seattle in the federal district court for the Western District of Washington, alleging SPD's uses of force at the protests violated their First and Fourth Amendment rights and sought a temporary restraining order (TRO). *Black Lives Matter Seattle-King County v. City of Seattle*, 2020 WL 3128299, at *1 (W.D. Wash. June 12, 2020). The district court found "that on some occasions the SPD has in fact used less-lethal weapons disproportionately and without provocation." *Id.* at *2. On June 12, the court issued a TRO enjoining SPD "from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations" except where necessary "to protect against a specific imminent threat of physical harm to themselves or identifiable others or to respond to specific acts of violence or destruction of property." *Id.* at *5. The TRO was later converted to a preliminary

injunction on stipulation of the parties. *Benton v. City of Seattle*, 2020 WL 4584214, at \*1 (W.D. Wash. Aug. 10, 2020).

C.     Procedural history

On June 15, 2020, the recall petitioners "filed a statement of charges with the King County Elections Department seeking the recall of Mayor Durkan." 1 CP at 1. The King County Prosecuting Attorney's Office prepared the following ballot synopsis:

> As alleged by King County voters Elliott Grace Harvey, Alan L. Meekins, Jr., Courtney Scott, Leah Solomon and Charlie Stone, shall Jenny Durkan be recalled from office for misfeasance, malfeasance, and violation of the oath of office, based on the following charges:
>
> Mayor Durkan endangered the peace and safety of the community and violated her duties under state and local laws and her oath to uphold the federal and state constitutions when she:
>
> (1) Issued a citywide curfew without sufficient notice for individuals to safely disperse;
> (2) Failed to institute new policies and safety measures for the Seattle Police Department when using crowd control measures during a public health emergency;
> (3) Failed to enforce police officer compliance with the Seattle Municipal Code and the Seattle Police Department Manual when the police attacked members of the press and street medics and failed to use appropriate de-escalation techniques;
> (4) Failed to protect freedom of speech and the right to peaceful assembly;
> (5) Wrongfully subjected bystanders to chemical weapons and crowd control measures;

(6) Allowed police to leak false information to the media about fabricated crimes and threats;

(7) Issued an overbroad order prohibiting possession of certain items in areas of the city.

*Id.* at 2. The parties' briefing refers to the recall charges by letter, rather than by number, consistent with the statement of charges that the recall petitioners filed with the elections department. To avoid confusion, we use the parties' letter designations. The charges currently before this court are charge (2) (called Charge B in the briefing), charge (3) (called Charge C in the briefing), and charge (5) (called Charge E in the briefing).

After receiving the parties' written submissions and holding a telephonic hearing, the trial court issued an order on July 10. Charges A and C-G were dismissed as insufficient. The trial court allowed Charge B to move forward but determined it was overbroad as currently written because "[a]ny alleged failure of Mayor Durkan to prohibit use of chemical crowd control agents by SPD based on the early conduct before she can be said to have been aware, are legally and factually insufficient." 2 CP at 301. The court therefore narrowed Charge B to read,

> Mayor Durkan endangered the peace and safety of the community and violated her duties under state and local laws and her oath to uphold the federal and state constitutions when she failed to institute new policies and safety measures for the Seattle Police Department after learning of the use of chemical

> agents on peaceful protesters as a means of crowd control
> during a public health emergency.

*Id.* at 303.

Mayor Durkan timely moved for reconsideration regarding Charge B. The trial court requested a response. The recall petitioners filed a combined response and cross motion for reconsideration, attaching numerous new declarations. Mayor Durkan objected to the cross motion on the grounds that it was not timely filed. On July 29, the recall petitioners filed a motion to expedite the ruling, attaching several declarations that were filed in the federal tort case discussed above, which detailed events that occurred on July 25, to demonstrate the urgency of the matter.

On the same day that the motion to expedite was filed, July 29, the trial court issued an order denying Mayor Durkan's motion for reconsideration and declining to consider the recall petitioners' cross motion because it was "not noted for hearing." 4 CP at 793 & n.i. The court indicated that it considered the declarations the recall petitioners had attached to their answer/cross motion, but not the declarations attached to the motion to expedite, because the court "reviewed anew the entire court record through the date designated for briefing on the motion, July 24, 2020." *Id.* at 790. Both parties filed notices of appeal.

13

ANALYSIS

A.     Background law governing recall elections

Washington voters have a constitutional right to recall any nonjudicial elected official who "has committed some act or acts of malfeasance or misfeasance while in office, or who has violated his [or her] oath of office." CONST. art. I, § 33.  The statutes governing recall proceedings are at RCW 29A.56.110-.270.  *See* CONST. art. I, § 34.

In the recall process, the court's role is "to ensure that the recall process is not used to harass public officials by subjecting them to frivolous or unsubstantiated charges."  *In re Recall of West*, 155 Wn.2d 659, 662, 121 P.3d 1190 (2005).  It is up to the voters to determine whether the charges are true and, if so, whether they in fact justify recalling the official.  Courts therefore take all factual allegations as true.  *In re Recall of Boldt*, 187 Wn.2d 542, 549, 386 P.3d 1104 (2017).  We review the sufficiency of a recall petition de novo.  *Id.*

A charge is factually sufficient where the alleged facts, taken as a whole, "'identify to the electors and to the official being recalled acts or failure to act which without justification would constitute a prima facie showing of misfeasance, malfeasance, or a violation of the oath of office.'"

*Id.* at 548 (quoting *Chandler v. Otto*, 103 Wn.2d 268, 274, 693 P.2d 71 (1984)). A charge "is legally sufficient if it 'state[s] with specificity substantial conduct clearly amounting to misfeasance, malfeasance or violation of the oath of office.'" *Id.* at 549 (alteration in original) (quoting *Chandler*, 103 Wn.2d at 274). "Misfeasance," "malfeasance," and "violation of the oath of office" are statutorily defined:

> (1) "Misfeasance" or "malfeasance" in office means any wrongful conduct that affects, interrupts, or interferes with the performance of official duty;
>
> (a) Additionally, "misfeasance" in office means the performance of a duty in an improper manner; and
>
> (b) Additionally, "malfeasance" in office means the commission of an unlawful act;
>
> (2) "Violation of the oath of office" means the neglect or knowing failure by an elective public officer to perform faithfully a duty imposed by law.

RCW 29A.56.110.

There are two limitations on recall that are particularly relevant to this case. First, an elected official is not subject to recall "for the act of a subordinate done without the official's knowledge or direction." *In re Recall of Morrisette*, 110 Wn.2d 933, 936, 756 P.2d 1318 (1988). Second, "[a]n official may be recalled for execution of discretionary acts only if the execution of that discretion is done 'in a manifestly unreasonable manner,'"

which "may be shown by demonstrating discretion was exercised for untenable grounds or for untenable reasons." *In re Recall of Inslee*, 194 Wn.2d 563, 572, 451 P.3d 305 (2019) (internal quotation marks omitted) (quoting *In re Recall of Bolt*, 177 Wn.2d 168, 174, 298 P.3d 710 (2013)).

B.      The charges before the court, though by no means frivolous, are insufficient to support a recall election

There are three different charges before us in this case. Mayor Durkan has appealed the trial court's decision to allow Charge B to go forward. Charge B is as follows:

> Mayor Durkan endangered the peace and safety of the community and violated her duties under state and local laws and her oath to uphold the federal and state constitutions when she failed to institute new policies and safety measures for the Seattle Police Department after learning of the use of chemical agents on peaceful protesters as a means of crowd control during a public health emergency.

2 CP at 303.

The recall petitioners cross appeal the dismissal of Charge C, which states that Mayor Durkan

> [f]ailed to enforce police officer compliance with the Seattle Municipal Code and the Seattle Police Department Manual when the police attacked members of the press and street medics and failed to use appropriate de-escalation techniques.

1 CP at 2. They also cross appeal the dismissal of Charge E, which states that Mayor Durkan

> [w]rongfully subjected bystanders to chemical weapons and crowd control measures.

*Id.*

Although three different charges are before us, there is one essential dispute between the parties that underlies all three of them. The recall petitioners contend that SPD violated their own policies and individuals' constitutional rights, causing injuries and endangering the community, and that once Mayor Durkan became aware of these violations, she did not take further steps to intervene and take control of the situation. This failure to act, the recall petitioners contend, was misfeasance and a violation of her oath of office because Mayor Durkan (1) has the duties to "see that the laws in the City are enforced" and to "maintain peace and order in the City," SEATTLE CITY CHARTER, art. V, § 2, (2) has ultimate authority over SPD, including the authority to "assume command of the whole or any part of the police force of the City" in a time of emergency, *id.*, and (3) swore in her oath of office to "support the Constitution of the United States, the Constitution of the State of Washington, and the Charter and Ordinances of The City of Seattle." 1 CP at 30.

17

Mayor Durkan contends that carrying out her duties to enforce the law, maintain peace and order, and support the federal and state constitutions and local laws necessarily requires the use of discretion. She argues that the recall petitioners do not show that her failure to take any particular action was manifestly unreasonable. Instead, Mayor Durkan contends, the recall petitioners simply disagree with how she handled an evolving situation during an unprecedented public health emergency and widespread civil unrest, and that is not a permissible basis for recall.

The allegations in this case are deeply troubling and certainly cannot be considered frivolous. Because we treat the factual allegations in recall petitions as true, we must assume that both protesters and local residents who were minding their own business in their own homes suffered serious injuries and increased risk of exposure to COVID-19 because SPD responded to the protesters' exercise of their First Amendment rights with violence. If the allegations are true, those responsible must be held accountable. However, the petitioners do not show that our precedent allows Mayor Durkan to be held accountable through a recall election on the charges presented.

> 1. The recall petitioners do not show that Mayor Durkan's failure to take any particular action was manifestly unreasonable

In contending that Mayor Durkan's failure to take further actions to stop SPD's violations and protect the community, the recall petitioners suggest a number of actions that she could have taken. While most of the actions suggested are indisputably within Mayor Durkan's authority, the recall petitioners do not show that declining to take those actions was a manifestly unreasonable decision.

First, "[t]he Mayor could lawfully — as she even agrees — have taken charge of the police department because of the emergency that she herself declared" or "she could have lawfully dismissed the Chief of Police and, with the help of the City Council, replaced her with someone more respectful of the constitutional rights and the health of protesters." Resp. Br. & Opening Br. of Cross-Appellant at 21 (citing SEATTLE CITY CHARTER, art. V, § 2). The recall petitioners contend that "after it became abundantly clear that the use of chemical gasses during a respiratory pandemic was unreasonably dangerous," but SPD continued to use them and Chief Best did not put a stop to it, Mayor Durkan's failure to remove Chief Best was manifestly unreasonable. Reply Br. of Cross-Appellant at 4. However, Mayor Durkan, while a very experienced attorney, has no experience in running a police department or being a police officer, and attempting to do

so for the first time during an ongoing crisis seems unreasonable. Chief Best, on the other hand, has considerable experience, and declining to remove and replace her during this crisis does not seem manifestly unreasonable. Moreover, Chief Best has since resigned and been replaced, but the recall petitioners assert that police abuses continue, indicating that replacing the chief would not have solved the problem.

Second, the recall petitioners assert that Mayor Durkan "could have issued unambiguous orders to the Chief to ensure that when police used these weapons, they complied with the federal TRO, and only used them in positions involving 'life safety,' because the SPD has manifestly not been using them in that manner." Resp. Br. & Opening Br. of Cross-Appellant at 21 (referring to SEATTLE CITY CHARTER, art. V, § 2). However, in her executive order closing Cal Anderson Park on July 1, 2020, Mayor Durkan did clearly order that SPD comply with the TRO.[3] Compliance with the TRO was, of course, never optional, and if one order to comply from Mayor Durkan did not work, it is not manifestly unreasonable to think that another order to comply would not have resolved the situation.

---

[3] Executive Order 2020-08 (June 30, 2020), at 4, http://clerk.seattle.gov/~CFS/CF_321741.pdf [https://perma.cc/Q29H-HZ9C].

Third, the recall petitioners assert that Mayor Durkan could have ordered "mediation between the parties." Resp. Br. & Opening Br. of Cross-Appellant at 22. However, the record indicates that in many, if not most or all, instances, the individuals who "assaulted officers, set fire to police and citizen vehicles, smashed windows of and looted numerous businesses throughout the downtown core, and otherwise caused extensive mayhem and property damage" were not the protesters at all but, instead, "appeared to be unaffiliated with the peaceful march." 1 CP at 69. It is not manifestly unreasonable to believe that attempting to involve such people in mediation would be ineffective.

It is certainly possible to imagine other actions Mayor Durkan might have taken, perhaps issuing a moratorium on the use of tear gas and pepper spray altogether. Mayor Durkan asserts she could not have done any such thing because the Consent Decree "requires that policies relating to the use of crowd control tools be submitted to the Monitor, the DOJ, and the federal court for approval prior to implementation." Br. of Appellant at 31. This assertion is supported by the federal district court's issuance of a TRO in the Consent Decree case, and we agree that the Mayor could not have changed the policies without approval of the federal court. However, even if we assume that Mayor Durkan could have issued a temporary moratorium,

21

allowing the continued use of pepper spray and tear gas in life-threatening situations, and with the prior authorization of the police chief in accordance with the TRO, is not manifestly unreasonable.

2.      Our precedent does not support allowing a recall charge to go forward on the basis that Mayor Durkan failed to take further actions that have not been specified

The recall petitioners also contend that Mayor Durkan manifestly abused her discretion by failing to do "something entirely unimagined herein." Resp. Br. & Opening Br. of Cross-Appellant at 22. The recall petitioners' claim that Mayor Durkan's actions were not good enough, without specifying any actions that were manifestly unreasonable *not* to take, is insufficient to support a recall election. The petitioners do not cite any case allowing recall charges to go forward on such a basis. The petition is factually insufficient "because it does not state any specific facts regarding *how* [Mayor Durkan] deficiently performed [her] duties." *In re Recall of Kelley*, 185 Wn.2d 158, 169, 369 P.3d 494 (2016) (emphasis added).

Certainly, had Mayor Durkan refused to act at all, "simply turning a blind eye," such a complete failure to act might be sufficient to support a recall election. Reply Br. of Cross-Appellant at 1. *See In re Recall of Riddle*, 189 Wn.2d 565, 575, 403 P.3d 849 (2017). However, Mayor Durkan

did not completely fail to act. She sought expert input regarding SPD's crowd control policies on June 5, she consistently expressed her support for the protesters' constitutional rights and the limitations placed on the use of tear gas, and she ordered SPD to comply with the TRO. Though the petitioners are dissatisfied with Mayor Durkan's official actions, they have not demonstrated an adequate basis for recall.

CONCLUSION

If the alarming factual allegations in this case are true, as we must assume they are, then those responsible must be held accountable, including Mayor Durkan. However, our precedent does not allow Mayor Durkan to be held accountable on these charges through the process of a recall election. We reverse as to Charge B, affirm as to Charges C and E, and remand with instructions to dismiss the recall petition.

_____
Yu, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Gonzàlez, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Montoya-Lewis, J.

_____
Owens, J.

_____
Whitener, J.

24